J. GERBER & COMPANY, Inc.,
Plaintiff,

v.

SS SABINE HOWALDT, her engines, etc.,

v.

HOWALDT & COMPANY, Defendant.

PAN AMERICAN TRADE DEVELOPMENT CORPORATION, Plaintiff,

v.

SS SABINE HOWALDT, her engines, etc.,

v.

HOWALDT & COMPANY, Defendant.

Nos. 66 Civ. 2605, 66 Civ. 4241.

United States District Court,
S. D. New York.

Dec. 29, 1969.

Bigham, Englar, Jones & Houston, New York City, for plaintiffs; F. Herbert Prem, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendant; R. Glenn Bauer, Wharton Poor, New York City, of counsel.

PALMIERI, District Judge.

*Preliminary Statement*

These are two consolidated actions in admiralty in which redress is sought for sea water damage to a cargo of steel products transported by the SS Sabine Howaldt on a winter voyage from Antwerp, Belgium, to the ports of Wilmington, Delaware, and Alexandria, Virginia. The vessel is a relatively small cargo vessel with a low freeboard, hatch coamings only about four feet above the deck and two unusually large hatch openings, one aft and one forward of the bridge. The voyage began at Antwerp on December 15, 1965. The SS Sabine Howaldt arrived at Wilmington on January 3, 1966. She sailed from Wilmington on January 4, 1966, and began discharge of her cargo at Alexandria on January 6, 1966.

The steel products in question were transported to Antwerp from mills located at inland points in France, Belgium and Luxembourg. The sea water wetting occurred during the voyage, by admission of the master of the vessel, through leaky MacGregor hatch covers and down uncovered ventilators. Routine inspection of the cargo compartments during the voyage revealed that cargo had been wet.

The plaintiffs' evidence sufficiently established that the shipments were free from damage by sea water when delivered to the defendant at Antwerp.

The weather was stormy but not unusual for a North Atlantic winter crossing. The vessel took green seas over its hatch covers as well as spray over its superstructure. The captain testified to his having to look up on occasion to see the tops of the waves from the bridge. But considering the size and structure of the vessel and the time of year this was a foreseeable situation. The vessel had a freeboard of only about two feet when it left Antwerp and the captain who, apparently facetiously, referred to his ship as a "submarine ship," admitted that at sea, with only a "little wind" and the vessel "moving a little," the sea would run over the deck. With the hatch coamings admittedly about four feet above the deck, waves of about six feet could be expected to wash over the hatch coamings. Indeed, the captain expected, when he left Antwerp on December 15, 1965, to take water over his hatches a considerable part of the voyage; and further, that in any storm his hatch coamings would be struck by waves with considerable force.

In amplification of what has been said, and as a supplement thereto, the findings of fact and conclusions of law which follow are intended to demonstrate that the plaintiffs are entitled to recover for the damage to the cargo in question.

## FINDINGS OF FACT

1. J. Gerber & Company, Inc., plaintiff in 66 Civ. 2605, is a corporation organized and existing under the laws of the State of New York, with an office and place of business at 855 Avenue of the Americas, New York, N. Y.

2. Pan American Trade Development Corporation, plaintiff in 66 Civ. 4241, is a corporation organized and existing under the laws of the State of New York, with an office and place of business at 2 Park Avenue, New York, N. Y.

3. The Sabine Howaldt, a German flag vessel, owned by defendant Howaldt & Company, was time-chartered to Contramar S.A. for a voyage from Antwerp to Wilmington, Delaware, and Alexandria, Virginia. Contramar S.A. took delivery of the vessel at Antwerp on or about December 14, 1965. Continental Lines, S.A., acted as agent for Contramar S.A. in Antwerp.

4. The dimensions of the Sabine Howaldt are:

| | |
|---|---|
| Overall length | 306′ 4″ |
| Breadth | 40′ 7″ |
| Depth to tween deck | 15′ 4″ |
| Depth to upper deck | 23′ 7″ |
| Depth to quarterdeck | 26′ 10″ |
| Deadweight tonnage | 3,507 long tons |
| Gross tonnage | 2,288.43 |
| Net tonnage | 1,499.51 |

The vessel has four hatches, four holds for general cargo, and nine derricks worked with electric winches. The weather deck hatches are closed with MacGregor type panels, the tween deck hatches with wooden hatch covers. Although the hatches are referred to for shipboard purposes as hatches 1, 2, 3 and 4, there are actually two large hatch openings, one forward of the bridge and one aft of the bridge. The forward hold is served by a large hatch measuring 59.8 feet in length and 17¾ feet in width, while the aft hold is served by another large hatch measuring over 68 feet in length by 17¾ feet in width. Based on the number of bulkheads in the hold there are two holds, one forward and one aft. The bridge is situated amidships.

5. Howaldt & Company, defendant in both the above-entitled actions, is a corporation organized and existing under the laws of the Federal Republic of Germany, with an office at Flensburg, West Germany.

6. On or about December 14, 1965, Somef, S.A., delivered to Continental Lines, S.A., and the SS Sabine Howaldt, at the port of Antwerp, 665 "giant" coils of galvanized steel wire, owned by plaintiff J. Gerber & Company, Inc., for transportation to the port of Wilmington, Delaware. They were later loaded in the tween decks of the vessel. Three hundred ninety-seven of the coils were manufactured in Belgium and two hundred and sixty eight in France.

7. The galvanized steel wire was manufactured under the supervision of experienced technical engineers, and by processes customarily used in the fabrication of similar products. When the steel wire left the two mills for Antwerp, it was of good quality, in sound condition, properly packed and not wet or wet stained.

8. Upon delivery to defendant and the Sabine Howaldt at Antwerp, the shipments of plaintiff Gerber were not wet or rusty, having been protected in a covered shed by tarpaulins. They had not been wet by sea water.

9. After plaintiff Gerber's shipments were received by Continental Lines, S. A., they were loaded on board the Sabine Howaldt and Continental, on behalf of the master, duly issued five "clean" bills of lading, i. e., ladings not endorsed with exceptions as to appearance or condition of the cargo.

10. Upon discharge of plaintiff Gerber's shipments at Wilmington, defendant's marine surveyor, Quistgaard, and plaintiff's surveyor, Owen, in a joint survey, as well as Hartoch, plaintiff's vice president, examined the coils of steel wire and saw extensive conditions of rust and pitting. Their examinations of the damaged steel wire, together with the results of silver of nitrate tests made by the surveyors and chemists, established that the damage was caused by sea water wetting.

11. On or about December 14, 1965, 446 lifts of steel, beams, angles, channels, flats and bars, owned by plaintiff Pan American Trade Development Corporation, were delivered to defendant and the Sabine Howaldt at the port of Antwerp, for transportation to the port of Alexandria, Virginia.

12. Upon the aforesaid delivery to defendant and the Sabine Howaldt, the steel products of plaintiff Pan American were examined by Boeren, the charterer's chief tally clerk, accompanied by the ship's chief officer. Boeren found the steel products to be "in good condition, except rust," which he attributed to "fog and temperature"; that the rust spots were "atmospheric rusty" ; that it was "impossible" for sea water to get on the steel while on the dock.

13. Continental Lines, S.A., on behalf of the master duly issued nineteen bills of lading, six of which were clean; the remaining thirteen ladings bore exceptions of "rust," or "rust stained," or "wet before shipment." Notations to this effect were placed on the bills of lading by Boeren.

14. Atmospheric rust is a normal condition in steel products, giving it a slightly dull appearance when exposed to the atmosphere. Such appearance is readily distinguishable from heavy rust and pitting resulting from sea water wetting.

15. Upon discharge of plaintiff Pan American's shipments at Alexandria, defendant's marine surveyor, Carter, and plaintiff's marine surveyor, Pringle, in a joint examination, saw extensive conditions of rust and pitting in respect of the steel products of all nineteen bills of lading. Examinations of the steel, and silver of nitrate tests made by the surveyors, established that the damage was caused by sea water wetting; material from the damaged cargo was taken by Carter to a chemist whose tests confirmed the determination reached by the surveyors. The damages reported by defendant's surveyor Carter, and plaintiff's surveyor Pringle, as a result of their joint examination, relates only to rust and pitting caused by the sea water wetting. The estimates of damage agreed upon by those surveyors were based upon sea water wetting. Their estimates and depreciation allowances were fair and reasonable. None of the damages included in the depreciation allowances was of pre-shipment origin.

16. Pringle took photographs of the damaged steel after discharge from the Sabine Howaldt at Alexandria. The steel products of plaintiff Pan American, while lying on the pier at Antwerp, did not have the damaged appearance and condition shown in Pringle's photographs.

17. Upon discharge at the port of Alexandria, the cargo described in the six "clean" bills of lading, bearing numbers 5, 14, 23, 31, 32 and 36, was damaged by "heavy rust, salt" by reason of sea water wetting, similarly, as was the steel cargo covered by the thirteen bills of lading bearing the exceptions "wet before shipment," "rust stained" and "partly rust stained."

18. The steel products covered by Pan American's bill of lading number 25, which is not included in the complaint, and for which plaintiff Pan American made no claim for damage, bears the exception "Rust stained," "Wet before shipment," as appears on the mate's receipt for that bill of lading. Defendant's surveyor, Captain Carter, reported to defendant, and testified, that that shipment was not damaged.

19. The amount of plaintiff Gerber's damages was determined by agreement of Quistgaard, defendant's surveyor, and Owen, plaintiff's surveyor, after a sale of a part of the damaged coils of steel wire to Robinson Steel Company, at a price which they considered fair and reasonable. The difference between the sound market value of the entire shipment, less the salvage received from the said sale, plus disbursements incurred by plaintiff as a result of the damage, total $40,848.29. This sum represents Gerber's recoverable damages.

20. Plaintiff Pan American's steel products were inspected by Pringle, plaintiff's cargo surveyor and Carter, defendant's cargo surveyor, at Alexandria. They agreed upon percentages of depreciation due to sea water wetting. Those depreciations applied to the selling prices at which plaintiff Pan American had contracted to sell the shipments to Alexandria Steel Corporation and Todd Steel Corporation, resulting in a loss of $15,503.54. This sum represents Pan American's recoverable damages.

21. The master of the Sabine Howaldt admitted that sea water, during the voyage, had entered number 4 cargo hold in substantial quantity, and into the other holds in smaller quantities. This was caused by the penetration of sea water between the hatch coamings and the hatch covers as a consequence of the momentary but repeated lifting of the hatch covers during the working of the ship in heavy seas, and particularly because of the heavy rolling, pitching and twisting of the vessel in

the heavy weather encountered. The greater penetration of sea water into number 4 cargo hold was attributable in part to its location aft of the bridge structure where there were no bulwarks. In the way of the aft hatch there was an open railing permitting a heavy sea to run freely on and off deck and thus exposing the hatch covers to heavier pounding by the waves. The forward hatch (hatches 1 and 2) was protected by bulwarks and thus less exposed to sea water impact. The unusually large hatch openings inherent in the structure of the vessel caused a greater susceptibility to sea water penetration of its hatch covers when the vessel was laboring in heavy seas. Water frequently came over the deck and the hatches, and spray water came over the superstructure of the vessel. During the worst of the weather encountered the vessel shuddered and vibrated, rolled from 25 to 30 degrees and took green seas. Before the vessel entered heavy weather, the shutters on all ventilators were closed to keep out water. In addition to the closing of the shutters, the ventilators forward of No. 1 hold and aft of No. 4 were covered with canvas covers. Some sea water nevertheless penetrated as the ventilators were not made completely watertight. The only ventilators not covered with canvas were mushroom ventilators in the masts, 15 feet above the bridge. Wind driven spray from high waves caused some sea water to reach cargo through these ventilators as well.

22. Captains Quistgaard and Carter, defendant's marine surveyors, testified that the sea water had leaked into the cargo holds through the athwartship seams of the steel panels of the hatch covers. There are rubber gaskets between such panels and leakage of sea water through them can be attributed to "poor gasketing."

23. The master testified that plaintiffs' cargo may have been damaged by sea water which came down the ventilators serving No. 4 hold.

24. The Sabine Howaldt was equipped with MacGregor hatch covers composed of joined steel sections of the "single-pull" type. These are hatch covers made up of a number of steel panels chained together, each about five feet in length and extending across the width of the hatch. These panels are equipped with rollers so that they may be rolled open and closed on tracks by means of wire attached to the ship's winches. When the covers are in the closed position, they are lowered from the rollers and presumably made watertight by a rubber gasket or packing fitted around each panel which is compressed tightly between the panel and a knife edge on the hatch coaming or adjoining panel by means of a system of side wedges or clamps and cross-joint wedges.

25. MacGregor hatch covers and similar designs were developed after World War II and are now widely used, especially on new vessels. They are approved by classification societies and are safer for a vessel than the old type of wooden hatch boards covered with tarpaulins because they cannot be so readily stoved in by a heavy sea. They rely upon rubber gaskets to maintain watertightness, instead of relying upon canvas tarpaulins as did the older types.

26. The master of the Sabine Howaldt on the voyage in question was Martin H. Daedrich, 58 years old, with sea experience of 40 years, having obtained a master's license in 1934. He took command of the Sabine Howaldt in July, 1963, leaving that vessel for another vessel of the Howaldt fleet in 1966.

27. The ship's mean draft on sailing was 20' 1" in fresh water. The vessel was not down to her winter marks.

28. When the ship sailed from Antwerp, she had a freeboard of about two feet, and the height of the hatch coamings was approximately four feet above the deck. The master expected to have seas over his hatches for a "considerable" part of the voyage.

29. The master did not take a course by the southern route for low powered vessels but proceeded west around the south coast of England and upon leaving the southwest coast of England planned to sail the Great Circle course to the Delaware River. He anticipated encountering strong winds and high seas.

30. Vance, a former engineer consultant for the manufactuer of the MacGregor type hatch covers, included among his duties in that employment the inspection of ships that had reported leakages through MacGregor hatch covers. In the course of his employment he had inspected and supervised the repair of such hatches on from 300 to 350 ships. The leaks in those MacGregor hatch covers occurred by reason of the vessel owner's improper maintenance.

31. MacGregor hatch covers, if properly maintained, will not, under almost all foreseeable circumstances, raise and lower above the coaming. They should prevent the entrance of sea water under almost all foreseeable sea and wind conditions. However, no suitable means have yet been found to completely seal a hatch so as to provide absolute insurance against the entry of sea water under every possible combination of circumstances. Conceivably, an extremely severe storm of prolonged duration could so affect a vessel having the architectural characteristics of the SS Sabine Howaldt as to place so severe a strain upon properly maintained MacGregor hatch covers that the jerking, shaking and vibration of the vessel, coupled with continuous pounding by and submersion in green seas, could overcome such hatch covers to the point of leakage. So severe a state of affairs did not, however, occur during the voyage in question.

32. The master was aware of the possibility that the hatch covers might admit water during the voyage if heavy seas were encountered. Under such circumstances, sea water could have been kept from penetrating the hatch covers and flooding the cargo holds by securing tarpaulins over the hatch covers.

33. The hatch covers of the Sabine Howaldt were unseaworthy at the start of the voyage because of their tendency to admit sea water in heavy seas into the cargo holds and defendant failed to prove the exercise of due diligence to avoid that situation. There was insufficient evidence to establish the condition of the hatch covers during any time other than the period of the voyage in question.

34. Defendant's experts testified that if the Sabine Howaldt commenced her voyage with hatch covers in excellent condition, battened down properly and tightened with good gaskets, they would not expect sea water to leak through the covers into the cargo holds under the sea and weather conditions described in the log book.

35. The log book entries show a wind force of 10 on the Beaufort Scale during various watches on five days of an eighteen day voyage. On one day only, during the morning watch, viz., December 23, the log entry states that the ship passed "through hurricane-like rain squalls." The ship's chief officer testified that the winds "were gusts and not hurricanes."

36. The sea and weather conditions experienced by the Sabine Howaldt were such as to be reasonably anticipated on a North Atlantic winter voyage by an experienced navigator.

37. The sea and weather conditions entered in the ship's log were less severe than those described by the master in his deposition.

38. The items of damage to the ship, as listed in the log, are not "important damages."

39. The character of seas and weather recorded in the log book do not constitute a "peril of the sea."

40. The Sabine Howaldt, a ship of approximately 1500 net tons, with a freeboard of but one to two feet, with hatch coamings only about four feet above the deck, was unseaworthy in proceeding on a North Atlantic winter voyage with MacGregor hatch covers sus-

ceptible to leakage upon encountering heavy seas.

41. The defendant failed to take all reasonable precautions to assure and safeguard the watertight integrity of the SS Sabine Howaldt during the voyage in question.

42. None of the damage to the cargo in suit was caused by pre-shipment atmospheric conditions or by pre-shipment exposure to salt water. All of the damage was caused by sea water which penetrated the hatch covers and the ventilators of the SS Sabine Howaldt during the voyage in question.

### CONCLUSIONS OF LAW

■ 1. The Court has jurisdiction of the subject matter and of the parties. This litigation involves maritime causes of action for breach of contract and cargo damage which are within the jurisdiction of this Court. 28 U.S.C. § 1333.

2. The ownership of the cargo by the respective plaintiffs was not disputed.

3. The defendant owned the SS Sabine Howaldt and, on the voyage described in the complaints, had time-chartered her to Contramar, S.A.

4. The bills of lading were issued by authority of the master.

■ 5. These bills of lading were not only the ship's contract, but that of the vessel owner whose master issued them. Gans S. S. Line v. Wilhelmsen, 275 F. 254, 262–263 (2d Cir. 1921); The Poznan, 276 F. 418, 432 (S.D.N.Y.1921); Capitaine Faure, 10 F.2d 950, 963 (2d Cir. 1926).

■ 6. The SS Sabine Howaldt, having transported cargo for two or more shippers, she was a common carrier. Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U.S. 397, 437, 9 S. Ct. 469, 32 L.Ed. 788 (1889); The Ella Pierce Thurlow, 300 F. 103, 105 (S.D. N.Y.1921).

■ 7. As the SS Sabine Howaldt was engaged in the transportation of goods to ports of the United States, in foreign trade, the rights of the parties are governed by the provisions of the U. S. Carriage of Goods by Sea Act (46 U.S.C. §§ 1300 et seq., 1312).

■ 8. Plaintiffs' delivery of the steel cargo to defendant at Antwerp free from sea water wetting, and defendant's delivery of same at the respective destinations damaged by sea water, established plaintiffs' prima facie case of liability. Under that state of proof defendant, if it is to secure exoneration must show that the immediate cause of the damage is within a statutory or contractual exception against liability. Defendant has failed to make this showing. The Vallescura, 293 U.S. 296, 304, 55 S. Ct. 194, 79 L.Ed 374 (1934); Jahn v. Steamship Folmina, 212 U.S. 354, 363, 29 S.Ct. 363, 53 L.Ed. 546 (1909); Caterpillar Overseas, S.A. v. S.S. Expeditor, 318 F.2d 720, 724 (2d Cir. 1963). Schroeder Bros. Inc. v. The Saturnia, 226 F.2d 147, 149 (2d Cir. 1955); Gilmore & Black, The Law of Admiralty, 162–163 (1957).

■ 9. Defendant having failed to show that the immediate cause of the sea water damage is within a statutory or contractual exception, it is liable without proof of negligence. Missouri P. R. Co. v. Elmore & Stahl, 377 U.S. 134, 143–144, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964); Isthmian Steamship Co. v. California Spray-Chemical Corp., 290 F. 2d 486, 491, 493–494 (9th Cir. 1961); Levatino Company v. M/S Helvig Torm, 295 F.Supp. 725 (D.C.N.Y.1968).

■ 10. The plaintiff adduced sufficient and persuasive evidence to establish that the cargo in suit was not exposed to or damaged by salt water prior to shipment; that the damage for which plaintiff is entitled to recover resulted solely from sea water wetting during the voyage of the SS Sabine Howaldt which began at Antwerp on December 15, 1965, and that the proximate cause of this damage was the unseaworthiness at the time of its departure from Antwerp, and particularly its defective

hatch covers and insufficiently protected ventilators.

 11. Defendant failed to exercise due diligence to make its ship seaworthy and to properly equip and supply the same as required by Section 3(1), (2) of COSGA (46 U.S.C. § 1303(1), (2)), in that it permitted its ship to proceed on the voyage with defective hatch covers and insufficiently protected ventilators.

12. The character of the seas, winds and weather encountered by the SS Sabine Howaldt during the voyage in suit did not constitute a peril of the sea. Propeller Niagara v. Cordes, 21 How. 7, 16 L.Ed. 41 (1858); The Delaware, 14 Wall. 579, 20 L.Ed. 779 (1871); The Rappahannock, 184 F. 291, 294 (1911); The Rosalia, 264 F. 285 (2d Cir. 1920); The Rosalie Hull, 4 F. 2d 985, 987 (2d Cir. 1925); The Edith, 10 F.2d 684, 689 (2d Cir. 1926); Edmond Weil, Inc. v. American West African Line, 147 F.2d 363, 366 (2d Cir. 1945).

13. The SS Sabine Howaldt was unseaworthy for a winter North Atlantic crossing as she left port at Antwerp on December 15, 1965. Cf., Edmond Weil, Inc. v. American West African Lines, *supra*.

14. The defense of "peril of the sea" is unavailable to the defendant even if it be assumed that a "peril of the sea" existed. Since the negligence of the carrier has been sufficiently established it becomes liable for cargo damage even though such damage results in part from a cause for which the carrier is not liable. Clark v. Barnwell, 12 How. 272, 13 L.Ed. 985 (1851); The Edwin I. Morrison, 153 U.S. 199, 211, 14 S.Ct. 823, 38 L.Ed. 688 (1894); Pioneer Import Corporation v. The Lafcomo, 49 F.Supp. 559, 563 (S.D.N.Y.1943), aff'd 138 F.2d 907, 908 (2d Cir. 1944), cert. denied Black Diamond Lines v. Pioneer Import Corp., 321 U.S. 766, 64 S.Ct. 523, 88 L.Ed. 1063; Schroeder Bros. Inc. v. The Saturnia, 123 F.Supp. 282, 292 (S. D.N.Y.1954), aff'd 226 F.2d 147, 150 (2d

Cir. 1955). See Prosser, Torts, 324 (3d ed. 1964).

15. The SS Sabine Howaldt and defendant Howaldt & Company are liable to plaintiffs for their respective losses in the following amounts, with interest and costs, viz.,

Plaintiff J. Gerber & Company, Inc.     $40,848.29
Plaintiff Pan American Trade Development Corporation     $15,786.20.

Submit on notice proposed judgment consonant herewith.