NICHIMEN COMPANY, Inc., Plaintiff,

v.

MV FARLAND, her engines, boilers, etc.,
and
A/S Vigra, Defendants.

No. 65 Ad. 1278.

United States District Court,
S. D. New York.

Oct. 29, 1971.

Donovan, Donovan, Maloof & Walsh, New York City, for plaintiff; David L. Maloof, Donald M. Kennedy, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendant Vigra; M. E. DeOrchis, Chester D. Hooper, New York City, of counsel.

Symmers, Fish & Warner, New York City, for defendant Seaboard; William Warner, New York City, of counsel.

## OPINION

BONSAL, District Judge.

Plaintiff Nichimen Company, Inc., of New York, N. Y., instituted this action for cargo damage against the MV FAR-LAND, her owner A/S Vigra ("Vigra"), and the time charterer Seaboard Ship-

ping Co., Ltd. ("Seaboard"). The issues were tried before the court without a jury.

Plaintiff, a wholly owned subsidiary of Nichimen Co., Ltd., purchased 280 coils of steel from Nichimen Co., Ltd. (of Tokyo, Japan) by invoice dated December 15, 1964 and irrevocable letter of credit payable on presentation of clean on board bills of lading.

On August 8, 1963, Vigra, as owner of the FARLAND, had entered into a time charter with Seaboard as charterer. Clause 8 of that time charter provided:

"8. * * * The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, and trim the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for cargo as presented, in conformity with Mate's or Tally Clerk's receipts."

On December 7, 1964, a "Freight Contract" was entered into between Seaboard as "Timechartered Owners" and plaintiff as "Charterers" whereby Seaboard agreed to supply a minimum of two holds of the FARLAND for the transportation of plaintiff's steel coils from Wakayama, Japan to New Haven, Connecticut. The rate of freight was "$9.00 (nine dollars) U. S. Currency per long ton F.I.O. fully prepaid in New York on telegraphic advice of completion of loading and signing Bills of Lading." The "Freight Contract" provided further that:

"The carrier does not assume the care, custody, control or safety of, and shall not be liable for the cargo until after it is loaded on board the vessel, nor for demurrage, storage or any other charges that may accrue against shipment while awaiting delivery to vessel.

&ast; &ast; &ast; &ast; &ast; &ast;

"Subject to provisions of carrier's bill of lading form currently in use in connection with shipments to destination named above."

The coils consigned to plaintiff were loaded on board the FARLAND, a six hold self-trimming bulk carrier, at Wakayama, Japan, on December 14–15, 1964. The FARLAND had no 'tween deck.

The coils, which weighed from 3–9 tons each, were strapped by $1\frac{1}{4}''$ x $\frac{1}{16}''$ steel bands—two around the circumference and five passing through the eye at equal intervals. This is the usual manner of strapping steel coils, and the strapping was sufficient for this type of cargo. Edge protectors consisting of steel strips were also used.

While plaintiff paid the cost of loading the coils on board the FARLAND under the "Freight Contract," the coils were stowed and lashed under the supervision of a "specialist" who was hired by Aall & Co., Ltd. ("Aall & Co."), Seaboard's port agent at Wakayama. One hundred forty-two coils were stowed in Hold No. 2 from the after bulkhead and forward in six rows, two tiers high. The forward row was not fully stowed, however, as there was an opening at the center which was shored off with heavy lumber. One hundred thirty-eight coils were stowed in Hold No. 4 from the after bulkhead and forward in three rows, three tiers high. In both Holds Nos. 2 and 4, the coils were stacked up at the after end and the remainder of the hold was left empty. All of the coils were stowed on the round with their ends facing fore and aft and were lashed with wire, turnbuckles and open turnbuckle hooks. The lashings were secured to pad eyes welded to the side bulkheads in Hold No. 2 and to pad eyes welded to the after bulkhead in Hold No. 4. According to the master of the FARLAND, "very little" wood was used, but some wood, in dimensions of 1 x 2, 2 x 4, 2 x 5, and 1 x 6, was used between some of the coils as dunnage to prevent them from shifting. The wire, turnbuckles, hooks, pad eyes, and wood were provided by Aall & Co., Seaboard's agent. The master testified in his depo-

sition that Seaboard's "specialist" directed that the coils be stacked at the after end of Holds Nos. 2 and 4 because the FARLAND was scheduled to stop at Vancouver, British Columbia, en route to New Haven to load Seaboard's lumber in all six holds and Seaboard desired as much space as possible in the bottom of Holds Nos. 2 and 4 to operate fork lifts when loading the lumber.

Nippon, Kaiji, Kentei, Kyokai, general marine surveyors, attended aboard the FARLAND on December 14–15, 1964, at the request of the shipper, Nichimen Co., Ltd., and reported on December 21, 1964 that the stowage of the cargo was proper and done in the best possible way to ensure safe transportation and delivery. In a deposition, the master of the FARLAND expressed his opinion that the coils had been properly stowed and lashed.

Upon completion of the loading on December 15, 1964, a bill of lading on Aall & Co.'s form was issued with respect to the 280 steel coils consigned to plaintiff. The bill of lading was signed by Aall & Co. "For and on behalf of the Master", and stated that the coils were shipped "in apparent good order and condition" by Nichimen Co., Ltd. on board the FARLAND for carriage from Wakayama to New Haven. The master testified that he did not see the bill of lading but that the usual practice was for Seaboard, or its agent, to sign the bills of lading on his behalf. The bill of lading was endorsed on the face as follows:

> "Freight payable as per the terms and conditions of the Charter Party and/or the freight engagement.
>
> "All the terms and conditions of the governing Charter Party and/or the Freight Engagement are herewith incorporated."

The Chief Mate signed a mate's receipt for the 280 coils.

The FARLAND sailed from Wakayama on December 15, 1964 for Vancouver with approximately 2,000 metric tons of cargo aboard out of her carrying capacity of 16,220 metric tons. On the 18th of December, the FARLAND encountered a storm. According the the vessel's rough log, the winds increased during the day and by 2200 on the 18th, the winds had reached force 8 on the Beaufort Scale (34–40 knots). The log entry for 2400 on the 18th states, "Ship is working heavily in the sea. Hull is shaking in trembling. Some water shipped." The log indicates that at 0120 on the 19th, the wind direction was east at force 10 (48–55 knots) and that the vessel's speed had been reduced; she was "lying on weather, pitching and some rolling." At 0500 on the 19th, the wind was E–NE and had reached force 11 (56–63 knots) and the vessel was "Lying in weather with steerage. Rolling and violent pitching." There follows an entry in the log which indicates that at 0815 on the 19th it was discovered that part of the cargo had shifted in Hold No. 2.

The master testified that at 0815 on the 19th "the whole cargo was shifted from the after end of the number 2 hold and spread all over the hold in one wave." He testified that this one wave, the height of which he estimated at 60 feet, lifted the FARLAND up, broke over her and dropped her "just like she fell off a rock." His inspection of the coils in Hold No. 2 shortly after 0815 on the 19th revealed that the lashings were broken. The master testified that the crew of the FARLAND had tightened the turnbuckles on the lashings in Hold No. 2 every day prior to the 19th.

At 1030 on the 19th, the following radio-telegram was transmitted by the FARLAND to Seaboard in Vancouver:

> "CARGO IN NO TWO HOLD SHIFTED AND DAMAGED STOP AT THIS POINT NO DAMAGE TO THE SHIP SECURING OF SHIFTED CARGO IMPOSSIBLE STOP HOVED TO STOP WIND FORCE 11 VERY ROUGH SEA
>
> MASTER"

There is no reference to a 60-foot wave in either the log or in the radio-telegram sent approximately two hours after the

time the log indicates that the coils had shifted.

The FARLAND proceeded to Vancouver, arriving at the pier at 1900 on December 30. On arrival, the coils in Hold No. 2 were examined by Thomas W. Morgan, a marine surveyor, at the request of Seaboard, Vigra, and the cargo underwriters. Morgan's initial inspection revealed that approximately one-third of the steel coils had opened up to such an extent that the whole area of the lower hold was covered with unwound coils. The FARLAND was scheduled to load Seaboard's lumber in all six holds in Vancouver, and since Morgan determined that it was not practicial to floor off the cargo in Hold No. 2 in its damaged and scattered condition, it was decided to cut some of the damaged steel and remove it to a scow placed alongside the vessel. Thereafter, part of the packaged lumber cargo was placed in Hold No. 2, the cut sections of steel coils were replaced in Hold No. 2, and all six holds of the FARLAND were filled with lumber. Morgan was of the opinion that this procedure was "the only practical method of tackling this situation." Seaboard paid all costs of cutting and restowing the steel sections in Vancouver.

The stowage of the lumber cargo was completed on January 15, 1965. It was snowing and raining throughout the loading operation, and the lumber stowed in Hold No. 2 with plaintiff's steel coils was soaking wet.

On January 18, the FARLAND proceeded to Boston and Providence to discharge Seaboard's lumber. Due to a longshoremen's strike, the FARLAND did not arrive in New Haven until March 1, 1965. On March 2, 1965, after the remaining lumber cargo had been discharged from the FARLAND, Captain Axel Jelstrup, a marine surveyor representing the cargo underwriters, Captain J. Stave, a marine surveyor representing Vigra, and George N. Axiotes, a marine surveyor representing Seaboard, inspected the steel coils in Holds Nos. 2 and 4. Their inspection of the coils in Hold No. 4 revealed that the steel strapping had parted on three of the coils, which were partially unwound, but that there had been no apparent shifting of the cargo in that hold. Their inspection of the coils in Hold No. 2 revealed that some of the coils, originally stowed against the after bulkhead, were lying against the forward bulkhead. The coils, and loose sections of steel, were occupying the entire tank top area. Bands had broken on several coils, and the coils sprung or partly unwound. In some instances, the coils had telescoped causing considerable distortion of them. Excessive rust was present on all of the coils in Hold No. 2 which was attributable to moisture given off by the lumber which Seaboard loaded at Vancouver.

Plaintiff had arranged to sell 219 of the coils to The Eastern Steel & Metal Co., West Haven, Conn., for $182,632.80, and the remaining 61 coils to Bowring Company, New York, New York for $48,644.93. On March 4, 1965, the day after the discharge of the FARLAND was completed, Captain Jelstrup examined the coils on the property of the New Haven Terminals, Inc.

Representatives from plaintiff and the Eastern Steel & Metal Co., plaintiff's principal customer, were present. The other surveyors did not attend although they had been advised of the re-examination. Eastern's representative indicated that he would accept the cargo discharged out of Hold No. 4 as sound. Captain Jelstrup testified that following considerable negotiations with Eastern's representative concerning the coils discharged from Hold No. 2, an agreement was reached on the following values of the coils:

"40% of 142 coils reduced to scrap value of $20.00 per metric ton.
20% of 142 coils with agreed value of $30.00 per metric ton.
30% of 142 coils with agreed value of $40.00 per metric ton.
10% of 142 coils with agreed value of $60.00 per metric ton."

Captain Jelstrup was of the opinion that he made "a rather good minimization of the loss." Surveyor Axiotes, who represented Seaboard at the initial inspection of the coils in Hold No. 2 on March 2, stated in his survey report that while he was not a party to the negotiations, "considering all the factors * * * it appears that the [depreciation] allowances are not unduly high."

In accordance with the agreed values of the coils, plaintiff received $101,961.-62 for 219 coils sold to The Eastern Steel & Metal Co. and $44,135.54 for the 61 coils sold to Bowring Company. Accordingly, plaintiff's loss in the sale of its coils was $85,180.57.

Captain Jelstrup also approved "without prejudice" a bill in the amount of $1,449.45 which plaintiff received from New Haven Terminals, Inc. for extra charges incident to the discharge of the damaged coils.

The court has subject matter jurisdiction and jurisdiction over the parties.

■ On the voyage from Wakayama to New Haven, the FARLAND carried the goods of Nichimen Co., Inc. and of Seaboard. Under the Freight Contract between Seaboard and Nichimen Co., Inc., Seaboard agreed to provide a minimum of two holds to Nichimen Co., Inc. Since the FARLAND was scheduled to carry Seaboard's lumber in all six holds from Vancouver, it appears that the parties did not contemplate that the entire ship would be used for Nichimen's cargo. In fact, plaintiff's coils only required 12% of the cargo capacity which left the FARLAND ample space to carry other cargo. The FARLAND, then, in carrying the cargo of two unrelated shippers, was acting as a common carrier. Jefferson Chemical Co. v. M/T Grena, 413 F.2d 864, 867 (5th Cir., 1969); The Sabine Howaldt, 310 F. Supp. 343, 350 (S.D.N.Y.), rev'd on other grounds, 437 F.2d 580 (2d Cir. 1971), Knauth, Ocean Bills of Lading–1953 (4th Ed.) p. 177.

Since the FARLAND was acting as a common carrier, Nichimen's contract of carriage was evidenced by the bill of lading, which, in this instance, was more than a mere receipt for goods delivered. Since the bill of lading incorporated the provisions of the Freight Contract, it was governed by the provisions of the United States Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1300 et seq.

■ Seaboard, in issuing the bill of lading through its agent Aall & Co., and in entering into the Freight Contract with Nichimen Co., Inc., became responsible for the proper loading and stowage of the steel coils. 46 U.S.C. § 1301(a) and § 1303(2). In addition, since the bill of lading was issued on behalf of the master, and since the master was appointed by Vigra, Vigra also assumed responsibility for the proper loading and stowage of the cargo. The Themis, 275 F. 254, 262 (2d Cir. 1921); The Sabine Howaldt, supra, 310 F.Supp. at 350, 46 U.S.C. § 1301(a) and § 1303(2).

■ Under COGSA, plaintiff established a prima facie case by proving receipt of the coils by the carrier in good order and condition, and delivery in damaged condition at their destination. Daido Line v. Thomas P. Gonzalez Corp., 299 F.2d 669 (9th Cir. 1962); Mamiye Bros. v. Barber Steamship Lines, Inc., 241 F.Supp. 99 (S.D.N.Y. 1965), aff'd, 360 F.2d 774 (2d Cir. 1966), cert. denied, 385 U.S. 835, 87 S. Ct. 80, 17 L.Ed.2d 70; Demsey & Associates, Inc. v. S.S. Sea Star, 321 F.Supp. 663 (S.D.N.Y. 1970). Proof of good order and condition at the time of shipment, sufficient for plaintiff's prima facie case, was evidenced by the clean on board bill of lading. 46 U.S.C. § 1303(4); American Tobacco Co. v. The Katingo Hadjipatera, 194 F.2d 449, 452 (2d Cir. 1951), cert. denied, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370 (1952); Demsey & Associates, Inc. v. S.S. Sea Star, supra. Under COGSA, the defendants Vigra and Seaboard were bound, before and at the beginning of the voyage, to exercise due diligence to make the ship seaworthy and to make all parts of the ship in which the coils were to be carried, fit and safe for their reception, carriage and preservation, and

to properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried. 46 U.S.C. § 1303(1) (2). Once plaintiff had established its *prima facie* case, the defendants had the burden of proving that the damage to the coils was not due to their negligence or that it was occasioned by one of the "excepted causes" in § 1304(2). Daido Line v. Thomas P. Gonzalez Corp., *supra;* Mamiye Bros. v. Barber Steamship Lines, Inc., *supra;* American Tobacco Co. v. The Katingo Hadjipatera, *supra.*

■ Vigra and Seaboard have failed to prove that the damage to the coils was not due to their own negligence, and indeed the weight of the evidence is to the contrary. Surveyor Morgan, who examined the coils in Hold No. 2 in Vancouver on behalf of Seaboard, Vigra and the cargo underwriters gave the following analysis of the method of stowing and lashing utilized by Seaboard's "specialist" in Wakayama:

"Normal procedure in securing cargo is to lash the cargo *down.* As can be seen from the accompanying sketch, this cargo, if anything, was secured in the opposite manner. A more prudent stowage of this cargo would have been to stow it only one tier high, and spread the load over a greater area, however, in this case, the load was placed at one end of cargo hold and two tiers high. The method of securing the cargo was by means of wire-rope, very poorly protected from cutting in way of the inner and outer edges of the coils. This wire rope was made fast by means of turn buckles. These turn buckles had an open hook on each end instead of a shackle and in some cases, two turn buckles were hooked together—possibly because the lashing wire was too short. By having open hooks on either end of the turn buckles, it was only necessary for one lashing to slacken off approximately one-inch. Thereafter, the hooks would unhook and all lashings in that area would be ineffective.

\* \* \* \* \* \*

"From the undersigned's observations and experience, it is his opinion, that the Cargo on the M. V. "FARLAND" was damaged initially due to the poor method of stowing and lashing—possibly aggravated to some extent by heavy weather encountered by the vessel."

Melvil D. Voge, a cargo surveyor who had sailed two years as master, testified for plaintiff as an expert on the stowage of steel coils. Based on the master's testimony, extracts of the log, the stowage plan in Wakayama, the stowage plan in Vancouver, the mate's sketch of stowage in Hold No. 2, photographs, and Captain Jelstrup's survey report, Voge was of the opinion that there were many serious defects in the stowage. The most important defects according to Voge were the fact that the coils were stacked up at one end of the hold rather than in a single tier using the entire tank top so that it would be more like block stowage, and the fact that in Hold No. 2 the lashings were secured to pad eyes on the sides of the vessel rather than to the after bulkhead as in Hold No. 4. He also cited the lack of protection between the lashings and the sharp edges of the coils, the open turnbuckle hooks, insufficient dunnage between the coils, and other defects. He was of the opinion that the timber used to shore up the empty space in the first row of coils was not strong enough to hold the cargo. He concluded that "all of these things \* \* \* constituted quite improper stowage for a cargo like this at this time of year."

Despite the report of Nippon Kaiji Kentei Kyokai, surveyors for Nichimen Co., Ltd., the court finds on the basis of the evidence presented that the damage to the coils in Hold No. 2 was due to improper stowage in stacking them at one end of the hold, the improper manner in which they were lashed and secured, and the negligent handling of the coils in Vancouver.

■ Vigra and Seaboard have likewise failed to prove that the damage to

the coils was occasioned by one of the "excepted causes" in § 1304(2). The evidence shows that the coils had been properly and adequately strapped for the voyage. While defendants contend that any damage to the coils was caused solely by a peril or danger of the sea, an exception to liability provided by § 1304(2)(c), defendants may not come within that exception due to their own negligence. As stated in Gilmore & Black, The Law of Admiralty, § 3–32, p. 140, " * * * in a sense, the absence of negligence as a concurring cause may be said to enter into the very definition of a sea peril, so that, in order to establish an exception under this clause, the ship would have to establish freedom from negligence." *See,* J. Gerber & Company v. S.S. Sabine Howaldt, 437 F. 2d 580, 588–589 (2d Cir. 1971).

In any event, the character and nature of the winds and the seas, even without the negligence of the defendants, were neither sufficiently severe nor unexpected to constitute a "peril of the sea." The term "peril of the sea" means nothing more than weather encountered which is too much for a well founded ship to withstand. A well founded ship is expected to stand up to the usual bad weather which is "normal for a particular sea area at a particular time" but not to "an unusual combination of the destructive forces of wind and sea which a skilled and experienced ship's master would not expect." J. Gerber & Company v. S.S. Sabine Howaldt, *supra* at 595, 596. There was no evidence that the storm had caused damage to any part of the FARLAND. The telegram of the master sent immediately after the cargo was damaged specifically stated that there was no damage to the ship. Plaintiff's expert witness, William Donn, a professor of meteorology and oceanography at City College of New York and director of the Atmospheric Sciences Laboratory at Columbia University, testified that, based on historic weather maps of the Pacific and the Mariner's Weather Log, the vessel encountered a storm which, although intense, was an example of one which occurs commonly in the month of December in the North Pacific. The unusual occurrence of the 60-foot wave testified to by the captain was not corroborated in the log nor in the radio telegram sent immediately after the cargo was damaged. Professor Donn further testified that, based on the conditions as recorded in the ship's log, he calculated the height of the wave at the time of the damage to the cargo to be 13 feet. He further testified that under the same conditions as recorded in the ship's log, the maximum height of the wave would be 25 feet and that conditions necessary to create a 60-foot wave did not exist.

Since defendants Vigra and Seaboard have failed to prove that the damage to the coils was not due to their own negligence or that it was occasioned by one of the "excepted causes" in § 1304(2), plaintiff is entitled to recover from Vigra and Seaboard for the damage.

Defendants contend that their liability is limited to $500. "per package" pursuant to 46 U.S.C. § 1304(5). However, the steel coils are not "packages" within that section of COGSA. The evidence establishes that the coils did not have a skid or any packaging preparation designed for its transportation or to facilitate its handling. Since the coils were not packaged within the meaning of the statute, the court must consider the customary freight unit. The authorities have generally referred to customary freight unit as the unit on which the charge for freight is computed. General Motors Corporation v. S.S. Mormacoak, 327 F.Supp. 666, 669 (S.D. N.Y. 1971). In this case, the unit is the long ton, so that the limitation of liability would apply per long ton. Therefore, the amount claimed is well within the limits of liability.

Accordingly, plaintiff is entitled to recover $85,180.57, plus interest, from Vigra and Seaboard for its loss in the sale of the coils due to their damaged condition. There was not sufficient proof

that the bill from New Haven Terminals, Inc. for $1,449.45 was solely due to extra charges incident to the discharge of the damaged coils.

 In Vigra's cross claim against Seaboard, Vigra is entitled to indemnity since under clause 8 of the time charter Seaboard had responsibility for stowage. Seaboard's "specialist" supervised the stowage and the lashing of the coils in Wakayama. The master did give his opinion that the stowage was proper, but he relied at all times on the "specialist" for stowing the cargo. Seaboard's agent not only supervised the entire stowage operation but also supplied all the wire, turnbuckles, hooks, pad eyes, and wood. Seaboard also supervised the entire stowage operation for the lumber in Vancouver. Thus, Vigra is entitled to be indemnified for any judgment against it and for reasonable legal fees. A/S Brovanor v. Central Gulf Steamship Corp., 323 F.Supp. 1029, 1031 (S.D.N.Y. 1970).

 Vigra is also entitled to recovery from Seaboard of $3,664.70 plus interest for charter hire wrongfully withheld by Seaboard. Seaboard withheld this amount because it charged Vigra with the expenses of cutting and restowing the damaged steel in Vancouver and making Hold No. 2 ready for the reception of its lumber cargo. Since Seaboard was responsible for the stow which was improper and the cause of the damage, clearly it has no claim against Vigra for the Vancouver expenses.

In view of the foregoing, the court finds that the FARLAND was a common carrier and the rights of the parties are governed by COGSA. Since the court also found that the damage to the cargo was due to negligence in stowage and not to a peril of the sea within the meaning of COGSA, and that there was no package limitation, Seaboard and Vigra are liable to plaintiff, Nichimen Co., Inc., for $85,180.87 plus interest, and Seaboard is liable to Vigra for any liability of Vigra to Nichimen Co., Inc. on

account of the damaged goods and for reasonable counsel fees.

The foregoing constitutes the court's findings of fact and conclusions of law. (Rule 52(a), F.R.Civ.P.)

Settle judgments on notice.