KANE INTERNATIONAL CORPORATION, Plaintiff,

v.

MV HELLENIC WAVE, her engines, boilers, etc.,

v.

UNIVERSAL CARGO CARRIERS, INC. and Hellenic Lines Limited, Defendants.

SPRAGUE & RHODES, INC., Plaintiff,

v.

S.S. HELLENIC WAVE, her engines, boilers, etc., and Hellenic Lines, Limited, Defendants.

Nos. 78 Civ. 3235 (GLG), 78 Civ. 4396 (GLG).

United States District Court, S. D. New York.

April 23, 1979.

Bigham, Englar, Jones & Houston, New York City, for plaintiff in Action No. 1; by John E. Cone, William R. Connor III, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendants; by M. E. DeOrchis, Chester D. Hooper, Manuel R. Llorca, New York City, of counsel.

Hill, Rivkins, Carey, Loesberg & O'Brien, New York City, for plaintiff in Action No. 2; by Marin B. Mulroy, New York City, of counsel.

## OPINION

GOETTEL, District Judge:

Among the issues that are not capable of precise judicial determination, the question of how bad a storm must be before it constitutes "heavy weather" has to be one of the worst. Once found "heavy," of course, the weather is a "peril of the sea" that excuses a shipowner's liability for cargo damage. The problem is much like the one posed by the ancient riddle which asks "how high is up?" Long ago one court responded:

> "There is no rule by which it can be defined with accuracy what degree of violence of the wind or waves is necessary to constitute a peril of the sea. Different cases must be determined according to their special circumstances."

*The Frey*, 106 F. 319 (2d Cir. 1901).

The determination, however, must nevertheless be made:

> "The difficult task is not to define in general terms a peril of the sea, but to determine whether some established facts and circumstances, like those proved in this case, fall within a sound definition. These opinions may be at variance and give to close cases little value as precedents. Yet this situation obtains largely throughout the whole administration of justice because it is impossible to do away entirely with the human element in applying the law to the facts."

*Duche v. Brocklebank*, 40 F.2d 418, 420 (2d Cir. 1930).

The defendant's vessel, the Hellenic Wave, a common carrier in international trade, loaded cargo during early 1978 in various east and south African ports. Among the cargo loaded was plaintiff Sprague & Rhodes' two containers of palletized tea, and plaintiff Kane International Corporation's cartons of cashew nuts. These cargoes were loaded in the # 3 hold, upper 'tween deck, along with other cargo, including two sealed containers of empty freon bottles.

The vessel departed from South Africa bound for New York on January 29, 1978. On February 12th, while in the North Atlantic east of Bermuda, the vessel encountered a storm. For three days she proceeded at reduced speed and eventually had to hove to in order to ride out the storm.

When the storm abated, the ship's crew found that, in the # 3 upper 'tween deck, three of the four containers (two with tea and one with empty freon bottles) had broken loose from the stow, causing damage to themselves and adjacent cargo. The containers of tea had been smashed, as had the entire face of the stow of cashew nuts. The empty freon cylinders had broken loose from the containers and were rolling about the deck with loose cashew nuts, tea, pallets and dunnage.

Plaintiffs' expert testified that, in his opinion, the gas cylinders could have broken loose from their containers first, thereafter knocking the tea containers loose, or that the cylinder containers themselves could have broken loose first, resulting in the same damage. In addition, the defendant's claim agent made an admission to the effect that the cylinders, not being secured within the container, had smashed through the side of the container and set off the other damage. His source of information for making such a statement, however, was never disclosed, and its accuracy is debatable. While it appears quite likely that only one container broke loose on its own, and that it in turn caused the other containers and cargo to break stow and become damaged, it is impossible to determine precisely which container initiated the loss.

The defendant produced an expert witness who attempted to demonstrate that the cargo was securely stowed and that the ship's loading was in all respects seaworthy. (This testimony, if believed, would be compelling evidence that the damage occurred because of an exceptional and unprecedented peril of the sea.) His conclusion, however, was based on several undocumented or highly questionable assumptions. The cargo had not been inspected by the Chief Mate immediately prior to the storm and its precise condition as it entered the storm is not known. (He did make an inspection several days earlier.)

The chief officer at his first deposition had made a drawing indicating how the containers were lashed. The next day, when he was deposed in the companion action (they were not yet consolidated), he changed his version of the lashing considerably. His initial description was demonstrably wrong. The accuracy of his second drawing is speculative. Moreover, even assuming the accuracy of the second diagram, it was impossible for an expert to give a definitive opinion concerning the lashings since the necessary components for calculating stresses were missing. The expert, who had not read the Chief Mate's deposition and proceeded only from information supplied by defendant's counsel, did not know the precise length of the lashings, nor did he know the angle of the lashings from the containers to the turnbuckles. He acknowledged that the lashings were not symmetrical in configuration, which is always desirable, and that there may have been tight lashings on one side and not the other, which could have caused the wracking of the containers. Consequently, little weight can be given to his conclusion.

Much of the testimony at trial revolved around the question whether the storm was so unexpectedly severe that it constituted heavy weather. The rough log kept contemporaneously claimed Beaufort Scale forces of from 9 to 11. In the Captain's subsequently prepared smooth log he claimed winds of force 12. Based on all the evidence, including a substantial number of readings from other sources, we conclude that the storm's force was 9 to 10 on the Beaufort Scale—a strong to heavy gale. If it ever reached force 11, it was only for a short period around noon on February 12th. Even the defendant's meteorological expert seemed to concede that the winds did not exceed force 10, although he claimed that the seas were unusually high for the amount of wind experienced. He also acknowledged, however, that estimates of sea height are often inaccurate and can be best calculated by knowing the winds.

The Chief Mate testified that the storm was the worst in which he had ever been involved. We must note, however, that the Chief Mate had spent his entire eight years at sea with the defendant shipline and he had risen from the rank of deck boy to become recently a chief officer. As Judge Hulbert suggested in *Manuel Arnus*, 10 F.Supp. 729, 731 (S.D.N.Y.), aff'd, 80 F.2d 1015 (2d Cir. 1935), the mate's testimony was

"one of those exaggerations sometimes characteristic of the officers of a vessel, indicating their zeal to 'stick by the ship.'"

■ In considering whether a ship is seaworthy, the vessel must be fit for the use anticipated:

"[A] ship which holds itself out for transatlantic commerce during winter months must be able to withstand the seasonal weather which is to be expected at that time of year."

*Texaco, Inc. v. Universal Marine, Inc.,* 400 F.Supp. 311, 320 (E.D.La.1975). From the evidence, it would appear that, if the wind reached the force 11 scale (a storm), it would have been somewhat unusual, for *that* part of the ocean, at *that* time of the year. Yet at other times of the year, namely the hurricane season, storms of much greater intensity are experienced. And at that time of the year, a few hundred miles to the north, storms of that intensity are not uncommon. Of course, it must be remembered that this vessel was heading on a northwesterly course and would have, in a day or two, entered into the area to the east of Cape Hatteras where severe winter storms are expected. Nonetheless, defendant's expert argues that, while more severe winds could be expected, the fact that the vessel would be closer to shore would diminish the height of the seas.

The cases are legion which acknowledge that the North Atlantic in the winter is a most inhospitable place. As noted in 2A *Benedict on Admiralty*, § 153 (7th ed. 1977):

"Voyages which take vessels along the Atlantic Coast of the United States require them to face the notorious hazards of heavy weather off Cape Hatteras. In *The John B. Waterman* [86 F.Supp. 487 (S.D.N.Y.1949)], it was held that weather off Cape Hatteras in March which was measured at 9–10 on the Beaufort Scale did not constitute a peril of the sea; and a similar conclusion was reached in *The Emilia* [13 F.Supp. 7 (S.D.N.Y.1935)]. In *The City of Khios* [16 F.Supp. 923 (S.D.N.Y.1936)] on a December voyage in the North Atlantic, the vessel encountered a whole gale with squalls of hurricane force, yet it was held that the breaking down of her stowage—there being no structural damage to the vessel—did not result from a sea peril but from improper stowage."

The storm in the instant case amounted to a whole gale at most and such storms are to be expected on a voyage in the North Atlantic in mid-winter. *See The West Kebar,* 147 F.2d 363, 366 (2d Cir. 1945). Of course, as was noted by the Second Circuit in *J. Gerber & Co. v. S.S. Sabine Howaldt,* 437 F.2d 580, 596 (2d Cir. 1971) (a case which found heavy weather and has since stimulated litigation on this issue):

"No exact Beaufort Scale wind force can be referred to as the dividing line which will determine those cases in which a peril of the sea is present and those, below that mark, in which it is not. There are, however, few cases in which the winds are force 9 or below (i. e. 54 land miles per hour or 47 knots) in which there has been found to have been a peril of the sea, whereas there are many where the force has been 11 or above. This is still, however, a rough measure at best and not sufficient standing by itself. Other indicia are, assuming a seaworthy ship, the nature and extent of the damage to the ship itself . . . ."

Despite this advice it would still appear that

"Perils of the seas are understood to mean those perils . . . which are of an extraordinary nature or arise from irresistible force or overwhelming power, and which cannot be guarded against by the ordinary exertions of human skill and prudence."

*The Giulia,* 218 F. 744, 746 (2d Cir. 1914). More severe conditions than those encountered by the Hellenic Wave have been held not to constitute perils of the sea. *See, e. g., Houlden & Co. v. S.S. Red Jacket,* 1977 A.M.C. 1382 (S.D.N.Y.1977); *Nichimen Co. v. MV Farland,* 333 F.Supp. 691 (S.D.N.Y. 1971), *modified,* 462 F.2d 319 (2d Cir. 1972). While the parties debate the burden of proof on this issue, it would appear that, regardless, this storm, although severe, was not so extreme as to qualify as a "peril of the sea."

Other evidence supports this conclusion. The # 3 hold 'tween deck is the least af-

fected of any by the pitching and rolling of the ship in rough seas. Despite this, there was no damage to cargo in the other holds or decks.* Moreover, while it was claimed that there was some slight damage to the vessel itself, the repairs next made on the vessel (in Calcutta) show that nothing was done to the structure or superstructure of the vessel.

█ The absence of damage to the vessel itself is always an important consideration. *International Produce, Inc. v. S.S. Frances Salman*, 1975 A.M.C. 1521, 1537 (S.D.N.Y. 1975); *Nichimen Co. v. MV Farland*, 333 F.Supp. at 698; *see Ore Steamship Corp. v. D/S A/S Hassel*, 137 F.2d 326 (2d Cir. 1943). Indeed, the courts have often required that the structural damage be substantial. *The Ionian Trader*, 173 F.Supp. 29 (S.D.N.Y. 1959), *aff'd*, 279 F.2d 471 (2d Cir. 1960). In *J. Gerber & Co. v. S.S. Sabine Howaldt*, *supra*, there was substantial structural damage to the vessel. As stated in 2A *Benedict on Admiralty, supra*, at 15–8:

"In considering whether the weather encountered was sufficiently severe to be denominated a peril of the sea, courts consider as persuasive the extent of the structural damage which the vessel suffered. If lifeboats lashed on deck are carried away, if various steel fittings on deck are bent or damaged, and so forth, courts consider that such damage gives substantial support to a carrier's claim that damage to cargo resulted from a peril of the sea. On the other hand, if there was no structural damage or if the damage was limited to one fitting, such as a hatchway or a ventilator cowl, which led to damage to the cargo, courts will find with reluctance that the damage resulted from a peril of the sea."

Finally, although the defendant claimed that the severe effects of the sea had caused the failure of certain lashing equipment, which was otherwise new and sound, the ship nevertheless disposed of these broken items and provided no real proof as to their age, repair, or preloading condition.

The failure of the ship to produce this evidence creates an inference that the evidence would not be favorable to the defendant. *Hartford Fire Insurance Co. v. Calmar Steamship Corp.*, 404 F.Supp. 442, 448 (W.D. Wash.1975), *aff'd*, 554 F.2d 1068 (9th Cir. 1977).

Since we find that the defendants have not established that the loss was attributable to any enumerated exceptions contained in the bills of lading, or provided for in the Carriage of Goods by Sea Act, 46 U.S.C. § 1304(2), and since the plaintiffs have proved delivery of cargo in good order and condition, the plaintiffs are entitled to damages. With respect to plaintiff Sprague & Rhodes' claim for damage to the two containers of tea, a package limitation as to the 20 pallets limits them to $10,000 damage aboard the ship. However, it has an additional claim for damage caused after unloading when some of the cargo was left in the open. The parties have stipulated that the total damages to be awarded to Sprague & Rhodes, in the event it prevailed, would be $12,000. The evidence established that plaintiff Kane International had lost 194 cartons of cashew nuts with a value, including cost and freight, of $9,479.15. The plaintiffs are entitled to judgment in these amounts, with costs.

The foregoing constitutes the Findings of Fact and Conclusions of Law of the Court pursuant to Fed.R.Civ.P. 52. The Clerk will enter judgment accordingly.

SO ORDERED.

---

* The Chief Mate's deposition states that there may have been a slight amount of damage to some other cargo, but elsewhere in his deposition he indicates that there was none.