VAN MUCHING [SIC] & COMPANY, INC., Plaintiff,

v.

M/V STAR MINDANAO, her engines, machinery, tackle, apparel, etc. Star Shipping Company Fairmont Shipping (H.K.) Ltd. Botelho Shipping Corporation, Defendants,

v.

HEINEKEN BROUWERIJEN B.V., Third Party Defendant.

Civ. A. No. 82–1092.

United States District Court.
E.D. Pennsylvania.

Aug. 27, 1985.

Eugene Mattioni, Mattioni, Mattioni & Mattioni, John P. Penders, and Ralph P. Bocchino, Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, Pa., for plaintiff.

Robert B. White, Jr., Rapp, White, Janssen & German, Ltd., Philadelphia, Pa., for M/V Star Mindanao and Botelho and Fairmont.

James F. Young, Krusen, Evans & Byrne, Philadelphia, Pa., for Star Shipping.

Joseph T. Mallon, Dunn, Haase, Sullivan & Mallon, Media, Pa., for Heineken.

## FINDINGS OF FACT and CONCLUSIONS OF LAW

SHAPIRO, District Judge.

### INTRODUCTION

This is an action in admiralty for damages to cargo shipped in containers from Antwerp, Belgium to Philadelphia, Pennsylvania; it was instituted by plaintiff, Van Munching & Company, Inc. of New York ("Van Munching"), against the vessel M/V Star Mindanao ("Mindanao"), *in rem*, and her owner, Botelho Shipping Corporation ("Botelho"), her manager, Fairmont Shipping (H.K.), Ltd. ("Fairmont"), her time charterer, Star Shipping Company ("Star Shipping"), *in personam*. The court has jurisdiction pursuant to 28 U.S.C. § 1333. The issues were tried without a jury; the court now makes the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

Van Munching's maritime action *in rem* against the vessel Mindanao and *in personam* against her owner, Botelho, her manager Fairmont, and her time charterer, Star Shipping, alleged that the container cargo of beer on board the Mindanao shipped by Heineken Brouwerijen, B.V. ("Heineken") from the Port of Antwerp arrived in a damaged state at the Port of Philadelphia because of negligence in handling the cargo and the unseaworthiness of the Mindanao.

Mindanao, Botelho and Fairmont ("Botelho Group") asserted certain defenses and counterclaimed against Van Munching for negligence and breach of warranty and crossclaimed against Star Shipping for negligence in stowing and securing the cargo and for breach of the Time Charter Party Agreement.[1]

Star Shipping asserted as defenses to Van Munching's claim excepted causes under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.A. § 1304(2)(a), (i) and (q) and claimed that even if it were liable, Van Munching was contributorily liable for a share of the damages. Star Shipping crossclaimed against Botelho for breach of the Time Charter Party Agreement in providing an unseaworthy vessel for the voyage, for negligence of the vessel's crew and personnel in navigating and managing the vessel and inspecting the cargo during the Atlantic crossing, and for negligence in packaging and stuffing the beer cargo in the containers.[2]

Prior to trial, Botelho Group settled with Van Munching for the sum of $225,000 and assignment of Van Munching's cause of action against Star Shipping. Trial was held on the claim of Botelho Group, as assignee of Van Munching, against Star Shipping and on Star Shipping's crossclaim against Botelho.[3]

As assignee of Van Munching's claim, the Botelho Group seeks recovery from Star Shipping of the sum of $232,547.11 plus prejudgment interest at the rate of

---

**1.** Under a Time Charter Party Agreement, the charterer engages a vessel for a fixed period of time; the vessel is manned and navigated by the vessel owner and carries cargo wherever the charterer instructs. *See* Gilmore & Black, *The Law of Admiralty*, § 4–1 at 193 (2d Ed.1975).

**2.** The Botelho Group brought a third-party complaint against Heineken for insufficiency of packaging and stuffing the beer cargo within the individual containers. This claim was settled and dismissed.

**3.** The crossclaim of Botelho Group against Star Shipping was not tried; counsel for Botelho Group stated that if it prevailed on its crossclaim (as to which it had the burden of proof),

it should be indemnified for the amount paid in settlement plus counsel fees and expenses. But the settlement between Van Munching and Botelho Group precluded trial of the issues between them and Botelho Group elected to proceed on Van Munching's claim against Star Shipping instead of its own claim for contribution or indemnity against Star Shipping by reason of the settlement. Since Van Munching's claim against Botelho Group was settled and not tried to judgment, Botelho's right to indemnity rather than contribution by reason of its settlement remained unproved; it was not established either by its settlement with Van Munching or at the trial.

10% from March 6, 1982 to the present.[4] On its crossclaim, Star Shipping seeks the damage and loss allegedly suffered as a result of the casualty in the amount of $255,481.86.

## FACTS

The vessel Mindanao is a carrier designed for carriage of bulk cargoes. It is 564 feet in length and 85 feet in breadth with seven cargo holds.

The vessel is operated under the flag of the Republic of Philippines. At all relevant times, Botelho was the owner of the Mindanao and Fairmont was her manager.

A Time Charter Party Agreement dated December 5, 1980 was entered into between the owner, Botelho, and the time charterer, Star Shipping; Star Shipping was the time charterer of Mindanao at all relevant times.

The shipper, Heineken, is a foreign corporation engaged in the manufacture and sale of Heineken Beer. The consignee, Van Munching, a United States corporation, is the exclusive importer of Heineken Beer in the United States.

On February 16, 1982, Heineken delivered to Star Shipping, at the Port of Antwerp, Belgium, 31 forty-foot containers stuffed with 29,260 cases and 2,592 barrels of Heineken Beer. These containers were sealed at Heineken's premises in Rotterdam, to be unsealed at Philadelphia, the port of destination.

Of the 31 containers, 22 had cases of bottled beer, nine had kegs of beer. There was a 32d container of mineral water. Each of the 22 containers of bottled beer had been stuffed with 1,330 cases on 19 pallets. On each of the 19 pallets there were 70 cases stacked in seven tiers of 10 cases each. The pallets were stowed at the walls of each container with free space down the center. Since the pallets measured $37\frac{1}{4}'' \times 46\frac{1}{2}''$ and a container was

$8'6'' \times 40'$ [5] the free space down the center measured $27\frac{1}{2}$ inches. There was also free space at the rear of each container (the record does not permit an accurate statement; there was testimony that it was no more than 41 inches). (Tr. April 15, 1985, p. 49 Testimony of McCartney). Each pallet was $46\frac{1}{2}$ inches high and wrapped with a heavy gauge polyshrink wrap. Since a container was $8'6''$ high, there was a space between the top of the stow and the top of the container of at least 45 inches.

Each of the nine containers of kegs of beer had been stuffed with 288 barrels on 36 pallets. There were eight barrels on each of the 36 pallets. These barrels, 21 inches high, were held in place by hard plastic feet between $\frac{3}{4}$ and one inch high, secured to the pallet. The pallets measured $48'' \times 44''$ and were placed in a container in two tiers of 18 pallets (two rows of nine pallets in each tier). Each pallet with barrels on it was 28 inches high and they were stacked two pallets high, so there was approximately 40 inches of free space at the top of a container. Since a container was $8'6'' \times 40''$, there was little, if any, free space at the sides, but there was at least 40 inches of free space at the rear end of the container with nothing by the way of dunnage or other securing material to restrict the barrels in the container except that there was a polystrap wrapped around the perimeter of the barrels on the after four pallets.

Before loading, Captain Arnesen, port captain for Star Shipping, inspected the containers and found them in apparent good order and condition. Accordingly, Star Shipping delivered to Heineken a "clean" Bill of Lading signed by Star Shipping on behalf of the Captain of the Mindanao; a letter dated February 12, 1982 signed by the Captain had authorized the Charterer or his agents to sign a Bill of Lading on his behalf as per terms and conditions of the Charter Party. This Bill

---

4. In the alternative, Botelho claims indemnity for $225,000, the amount of its settlement, and attorneys' fees in excess of $89,000 if it prevails on either of the crossclaims.

5. If the container was only $8' \times 40'$ and the free space was $27\frac{1}{2}$ inches as testified, the pallets would necessarily have measured only $34\frac{1}{4}'' \times 45\frac{1}{2}''$.

of Lading acknowledged Star Shipping's receipt of the 31 forty-foot containers of beer in good condition.

Pursuant to Clause No. 8 of the Time Charter Party Agreement, the charterer, Star Shipping, had responsibility for loading and stowage of the cargo. The 31 containers, together with the one other container of mineral water, were loaded aboard the Mindanao, under deck, and stowed in Hold No. 2 of the vessel. Hold No. 2 was located between frames 143–163 of the vessel. The No. 2 starboard double bottom tank was located between frames 123 and 163. The No. 2 starboard ballast wing tank was also located between frames 123 and 163. The deck of Hold No. 2 was the tank top for the No. 2 starboard double bottom tank. The starboard ballast wing tank was connected to the starboard double bottom tank by means of two communication pipes located at the forward and aft ends of the tank.

The loading, stowing and securing of the 32 containers in Hold No. 2 under the supervision of Captain Arnesen, Star Shipping's Port Captain, and Captain Wilfred Malapad, the Chief Officer of the Mindanao, was according to a "securing plan" of Star Shipping except as mentioned hereafter. The "securing plan" called for stowage of the 32 containers, 40′ × 8′6″, in four tiers of eight containers each. Hold No. 2 was approximately 71 feet wide and 53 feet long.[6] A strip of wood dunnage, six inches wide, was placed on its bottom across the forward and aft end of the stow of containers. On top of the dunnage, single and double baseplates were positioned at both the forward and aft ends. Neither the dunnage nor the baseplates were secured in any way to the deck (or tank top).

The eight containers of the first tier were lowered into the hold one by one and stowed on these baseplates. The corner castings of each container had openings (or holes) fitting on top of these baseplates. Before the eighth container of the first tier was loaded and stowed, two extended baseplates were positioned at the port side

bulkhead of Hold No. 2. These extended baseplates had two sides: one flat side and one cone side. The flat part was toward the bulkhead side of the hold and the cone side was inserted into openings on the bottom corner castings of the containers. These extended baseplates were designed and positioned to keep the containers away from the bulkhead side of the hold.

After the first tier of containers was stowed in this manner, single and double stackers were positioned on the upper corner castings of the first tier across the forward and aft end. These stackers had double beams (or peaks); one went down into the upper corner castings of the first tier, and the other went into the openings of the bottom corner castings of the second tier of containers (when eight containers were lowered one by one into the hold, the openings of the bottom corner castings of each container were placed on the upper beams of these stackers). The second tier was attached to the first tier in this manner.

The second tier and the third tier were connected the same way; single and double stackers were positioned on upper corner castings of the second tier across the forward and aft end before the third tier was loaded. The bottom corner castings of the third tier sat on the upper beams of these stackers holding the third tier to the second tier. In conformity with the "securing plan" of Star Shipping, lashing wires, two wires to each container, were then connected to the bottom of the third tier at one end and attached at the other end to D-rings welded to the forward and aft bulkheads of Hold No. 2. These wires were connected to the D-rings by tensioners, stretched and adjusted so the wires were tightened. After those wires were adjusted and tensioned, the fourth tier of containers was loaded and stowed on top of the third tier.

The fourth tier was fastened to the third tier by twistlocks. These twistlocks were positioned between the openings of the upper corner castings of the containers on the

---

**6.** The Hold's width was 70′,11.35″ and length was 52′,3.7″.

third tier and the corresponding openings of the bottom corner castings of the containers on the fourth tier. Then these locks were twisted 90° so that the containers of the third tier and fourth tier were attached and the third and fourth tiers became in essence one unit. At the top tier four securing beams not required by the "securing plan" were added. All the material used for the stowage and securing of the cargo was supplied by Star Shipping.

After the stowage and securing of the containers according to plan, Mindanao's chief officer Captain Malapad, requested Star Shipping's Captain Arnesen to provide additional fastenings. Captain Arnesen added eight chains; four aft and four forward. The chains were connected to the fourth tier of containers and to D-rings crosswise. Both Captains then inspected the stow and were satisfied. The stowage operation began at 0800 hours and was terminated at 1100 hours.

The vessel sailed from Antwerp on February 16, 1982. On February 19, 1982, the vessel encountered a storm with very rough seas. The vessel was pitching and rolling heavily. The stormy weather continued through March 1, 1982. The containers were in good condition on two inspections of Hold No. 2 on February 21 and February 23, 1982. On February 25, 1982, at 0830 hours, vessel personnel discovered the collapse of the containers and salt water and beer in Hold No. 2. The damage was reported by the Captain the same day.

When the Mindanao arrived at Philadelphia on March 2, 1982, surveyors for the parties went on board to determine the extent of the damage. The cost of repairing 21 containers would have far exceeded what it would have cost to replace them; 11 of the 32 containers were only partially damaged. The first or bottom tier had seven containers completely damaged; second tier containers were also cracked but to a lesser degree than the first tier. In the upper two tiers the damage was less extensive than in the bottom two tiers. (Tr. April 15, 1985 pp. 78–79; Tr. April 16, 1985 p. 31). After discharge of the contain-

ers and cleaning of Hold No. 2, the surveyors also inspected the hold and found many cracks on the deck of the starboard side. The cracks were common with the No. 2 port and starboard double bottom tanks. The bottom corner castings of the bottom tier containers in Hold No. 2 lined up with the cracks that were found at the forward end of that hold. Chains and lashing wires that were to secure the containers in the hold were found broken or parted; single and double stackers were also found twisted.

On March 4, 1982, Captain Batista sent a letter to Heineken and Van Munching that alleged the cargo damage was caused by defective stuffing and packaging of the cases and kegs of beer within the containers. But the parties to the action have stipulated that Captain Batista had no prior experience on container ships and did not know what caused the containers to collapse (Stipulated Facts at ¶¶ 33 and 50).

## DISCUSSION

The cause or causes of the cargo damage must be determined to fix liability or apportion liability between the parties. The burden of proof on Van Munching's claim (assigned to Botelho) against Star Shipping is governed by COGSA, 46 U.S.C.A. § 1300 *et seq.* The burden of proof on the crossclaim of Star Shipping against Botelho for breach of the Time Charter Party Agreement is governed by English Law pursuant to Clause No. 54 of the Charter Party Agreement.

### A. Botelho, Assignee of Van Munching, Against Star Shipping:

Botelho was assignee of Van Munching's claim. Under COGSA, 46 U.S.C.S. §§ 1300–1315, the plaintiff established a *prima facie* case by proving that the carrier received cargo in good condition but unloaded it at destination in damaged condition. *Terman Foods, Inc. v. Omega Lines,* 707 F.2d 1225 (11th Cir.1983); *Nissho-Iwai Co., Ltd. v. M/T Stolt Lion,* 617 F.2d 907, 912 (2d Cir.1980); *Associated Metals & Minerals Corp. v. M/V Rupert de Larrinaga,*

581 F.2d 100, 101 (5th Cir.1978); *Vana Trading Co., Inc. v. S/S "Mette SKOU"*, 556 F.2d 100, 104 (2d Cir.1977); *Nichimen Company v. M.V. Farland*, 333 F.Supp. 691 (D.C.N.Y.1971), *modified and aff'd on appeal*, 462 F.2d 319, 325 (2d Cir.1972).

▪ A clean Bill of Lading is *prima facie* evidence that the carrier received the goods it describes and creates a rebuttable presumption that goods were delivered to the carrier in good condition; this makes plaintiff's *prima facie* case under COGSA, 46 U.S.C.A. § 1303(4). *Terman Foods v. Omega Lines*, 707 F.2d at 1227. Van Munching's Bill of Lading, signed by Star Shipping was clean; that is, absent any description of damage. There is no dispute that the containers of beer were in damaged state when delivered at the port of destination. Therefore, Van Munching-Botelho established a *prima facie* case.

▪ To avoid liability Star Shipping must show either that the damage was not caused by its negligence or that the damage resulted from one of the "excepted causes" under COGSA, 46 U.S.C.A. § 1304(2).[7] *See Vana Trading Co. v. S/S "Mette SKOU"*, 556 F.2d at 105; *Nichimen Company v. M.V. Farland*, 333 F.Supp. at 697. Star Shipping first tried to prove its lack of negligence in stowage and securing the cargo under its "securing plan." COGSA § 1304(2)(q). But Captain Arnesen, who supervised the stowage and securing of the containers on behalf of Star Shipping, was not experienced in stowing containers on bulk carriers like the Mindanao

and the cargo in Hold No. 2 was improperly stowed and secured.

Upon consideration of all the testimony and exhibits, Captain Allen's expert opinion [8] of the method of stowage and securing that should have been utilized to prevent the collapse was most persuasive:

It should have been done by, first of all, fixing the corner areas of both the front and rear with a substantial securement to the deck, with either the corner-type device or with an interlocking fixture, which would have protruded up into the bottom of the container. And it should have been secured across the front of the stow from port to the starboard, or starboard to port, and both the forward and after end with some kind of restraining device that would have prevented other movement of the individual containers in the—either a forward or after position.

The extended platens [plates] on the—both the right and left side would have been valuable had they been of sufficient material to restrict the movement. And there were no transverse securements on the top of the stow, on the four corners, which would have either prevented a transversed or longitudinal motion.

. . . . .

The inability for the bottom containers to take the racking forces beyond their design and capacity was also due to the lashings which should have been applied on the bottom tier, diagonally from the top corner fittings to a close deck posi-

---

7. Title 46 U.S.C.A. § 1304(2) provides in part:
(2) **Uncontrollable causes of loss.** Neither the carrier nor the ship shall be responsible for loss or damage arising from—
(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship;
. . .
(i) Act or omission of the shipper or owner of the goods, his agent or representative; . . .
(n) Insufficiency of packing;
(q) Any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault

or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage.

8. Captain Merle W. Allen has been a master marine surveyor and consultant since 1935. He is Chairman of the Board of Container Equipment Certification Corporation, one of three corporations in the United States for inspection, procurement, consulting, testing and other matters related to containerization. Captain Allen has served on ISO (International Standard Organization) and ANSI (American National Standards Institute) committees and on other committees relating to testing and investigation of containers.

tion adjacent to the front or rear of the containers.

(Tr. April 22, 1985, pp. 26–28).

Captain Allen pointed not only to the failure to secure either the dunnage or containers to the deck to inhibit fore and aft movement of the containers but to the failure to secure the top of the stow which was severely affected by racking movement:

> There are a number of different methods that are used for this procedure, however, I prefer to use a lashing which will go to the forward and after bulkheads and encompass the front of the stow or the rear of the stow so that it will minimize any type of forward or rearward motion. And, of course, the important part was the—in the transverse, was the inability to restrain that racking movement at the top of the stow. And that would have had to be done by a number of different types of cable lashings, tensioners.

(Tr. April 22, 1985, p. 28).

The stowage and security of the containers was not adequate or proper for the voyage. The collapse was the result of the bad stowage over inadequate dunnage, lack of longitudinal security, lack of transverse security on the top four corners of the stow, and lack of diagonal lashings in the top corner fittings of the bottom tier so that there was inadequate restraint of both the longitudinal and transverse motion of the block stow. Furthermore, the containers were stowed so that the doors were placed both forward and backward (intermixed); they should not have been stowed with their doors to the forward end because the forces generated from the longitudinal and racking motion tended to cause doors facing aft to open. This created additional pressure for collapse of these ends. Star Shipping failed to carry its burden of showing freedom from negligence in the stowage and securing of the cargo.

■ Star Shipping next claimed the benefit of exceptions under COGSA, 46 U.S. C.A. § 1304(2)(a)(i) and (q). First, Star Shipping alleged that the contents of the containers were improperly stowed and that this caused the collapse of the containers. Star Shipping established that the cases and kegs of beer on pallets were stowed inside the containers so that there was some empty space not filled and the goods could have moved inside the containers. But if the improper stowage of the goods inside the containers was the cause of the collapse, there would have been greater damage to the containers on the upper tiers. The evidence showed most damage to the first or bottom tier, damage to a lesser degree to the second tier, and least damage to the upper two tiers. On consideration of the pictures, the other exhibits, and the testimony, it is more likely than not that failure of the stow was due to lack of longitudinal and transverse securing, particularly on the bottom of the stow; this allowed the containers to move, and created racking forces exceeding the capability of the containers and causing their collapse. Star Shipping failed to prove that improper stowage of the cases and kegs in the container was the cause or a contributory cause of the damage or, if so, to what extent.

■ Second, Star Shipping alleged that the master's negligent navigation and management of the Mindanao, caused or contributed to, the collapse of the containers. Star Shipping contended that changes in ballast distribution raised the bow and accelerated the vessel's tendency to pound in heavy seas. Star Shipping also complained of the master's failing to reduce speed or alter course to ease the vessel's motion and decrease stress and strain on both the vessel and its cargo. But there was no satisfactory proof that the master of the Mindanao failed to use due diligence in navigation or management of the vessel. The vessel did change its course on February 24 and 25, 1982 (before and after the collapse of the cargo) and the worst weather was encountered on February 28, three days after the collapse of the containers.

Star Shipping has failed to convince the court that the master's conduct could have controlled the pounding of the Mindanao in

heavy seas so that the containers would not have collapsed. Star Shipping's securing plan just did not provide adequately for the unpredictable weather changes and heavy seas during an Atlantic winter voyage.

■ Finally, Star Shipping claimed the crew members were negligent in not inspecting the cargo during the voyage and that this failure to perform their normal duties contributed to the collapse of the containers. The crew inspected the stow three times between February 19 and February 25, 1982. On February 21 and February 23, 1982 the cargo in Hold No. 2 was inspected and was in order. The collapse of the containers was discovered during the third inspection on February 25, 1982.

Star Shipping alleged that the inspections were insufficient and that the crew should have gone into the hold, checked the lashings, and tensioned them if necessary. But the containers could not have been secured or their collapse prevented by the crew's intervention at sea in severe weather; the entire stowage and securing should have been adjusted and altered. The crew was not responsible for the collapse of the stow; there is insufficient evidence to sustain Star Shipping's allegation that failure to enter the hold and check the lashings was the proximate cause or a contributory cause of the collapse.

■ Even if the method by which the containers were stuffed or the negligence of the master or crew were contributory causes of the damage to the container cargo, Star Shipping failed to prove how much of the damage was attributable to the cause or causes for which it was not responsible.

> [w]here the state of the proof is such that the damage is due either to an excepted peril or to the carrier's negligent care of the cargo, it is for him to bring himself within the exception or to show that he has not been negligent.... Similarly, the carrier must bear the entire loss where it appears that the injury to cargo is due either to a sea peril or negligent stowage, or both, and he fails to show what damage is attributable to

sea peril.... *The carrier is charged with the responsibility for a loss which in fact, may not be due to his fault, merely because the law, in pursuance of a wise policy, casts on him the burden of showing the facts relieving him from liability.*

Schnell v. The Vallescura, 293 U.S. 296, 306, 307, 55 S.Ct. 194, 197 (1934) (emphasis added).

The carrier, Star Shipping, must bear the entire loss if it cannot show what portion of the damage is attributable to some cause for which it is not responsible.

Although the rule announced in *The Vallescura* predates COGSA's promulgation in 1936, it has been reinstated and followed in United States Courts to the present time.

*The Golodetz Export Corp. v. S/S Lake Anja*, 751 F.2d 1103, 1111 (2d Cir.1985). Even if the stuffing of the beer inside the containers, or the navigation and management of the Mindanao were deemed concurrent or contributory causes of the damage to the container cargo, the total absence of evidence to support an apportionment of damages requires that the carrier, Star Shipping, bear the entire loss.

Star Shipping has failed to defeat Van Munching's *prima facie* case by proving that it was free from negligence under COGSA, 46 U.S.C.A. § 1304(2)(q) or that the damage resulted from either of the other "excepted causes" under COGSA, 46 U.S.C.A. §§ 1304(2)(i) and (2)(a). Therefore, Van Munching's assignee, Botelho, is entitled to recover from Star Shipping its claim in the amount of $232,547, together with prejudgment interest at the rate of 10% from March 6, 1982.

**B. Crossclaim of Star Shipping Against Botelho:**

On the crossclaim of Star Shipping as charterer of the Mindanao against Botelho, her owner, for breach of the Time Charter Party Agreement, the issue is whether the Mindanao was unseaworthy as alleged.

Under the Charter Party the owner, Botelho, had to provide a seaworthy vessel.

Star Shipping asserts that this determination of liability is governed by COGSA and not by English law. Botelho asserts that COGSA is not applicable and that Clause No. 54 of the Time Charter Party Agreement expressly states that English law applies: "This Charter shall be construed and the relations between the Parties determined in accordance with the Law of England." Clause 37 of the Time Charter Party Agreement expressly states that a clause making the United States COGSA paramount is *not* part of the Time Charter Party Agreement (although to be included in all Bills of Lading).

■■■ Time Charter Party Agreements are contracts. The principles of construction applicable to ordinary commercial contracts apply to the construction of the terms of a Time Charter Party Agreement. *See Michael v. S.S. Thanasis,* 311 F.Supp. 170 (D.C.N.D.Calif.1970). Parties to a contract are free within certain limitation to choose their own governing law and to have their choice enforced by a court. *Michael v. S.S. Thanasis,* 311 F.Supp. at 177. No persuasive reason grounded in law or public policy prohibiting the parties to this Time Charter Party Agreement from choosing to have the law of England apply has been suggested. Therefore, English law applies. *See* Carver's *Carriage By Sea* § 941 at 717 (13th Ed., Vol. 2, 1982).

■■■ Under the law of England the burden of proving unseaworthiness rests upon the party who is claiming it. Carver's *Carriage By Sea*, § 158 at 124; Scrutton on Charter Parties, Art. 29 at 87, Note 4 (17th Ed.1964); *Waddle v. Wallsend* (1952), 2 Lloyd's Rep. 105, 139. Therefore, Star Shipping had the burden of proving the unseaworthiness of the vessel. It claimed that water entry into the cargo hold constituted an unseaworthy condition, citing *United States v. S.S. Wabash,* 331 F.Supp. 145 (S.D.N.Y.1971), and *Selcamerica, Inc. v. S.S. Barberbrook,* 390 F.Supp. 462 (S.N.N.Y.1975). Star Shipping alleges that this shifted the burden to Botelho to prove that the damage was not due to its negligence or failure to provide a seaworthy vessel. *Nissho-Iwai, Ltd. v. M/T Stolt Lion,* 617 F.2d 907 (2d Cir.1980). But this is not the law of England. Scrutton on Charter Parties, Art. 29 at 87, Note 4 (17th Ed.1964), states, "the burden of proving unseaworthiness rests upon the party who asserts it and the party intending to rely upon unseaworthiness must plead it with sufficient particularity ... *There is no legal presumption in the matter or any real shifting of the burden of proof."* (Emphasis added).

■■■ Star Shipping has failed to prove unseaworthiness of the vessel. Prior to calling at Antwerp, the Mindanao had been at the port of Brake, Germany, between February 7 and February 11, 1982. There Captain Arnesen examined Hold No. 2 on behalf of Star Shipping and found it in satisfactory condition and fit for loading. The vessel was "in class," *i.e.,* the Mindanao was properly maintained. (Tr. April 19, 1984, p. 129 *et seq.* (Testimony of Arthur H. Sulzer)). The vessel was seaworthy and fit for the purpose intended under the Time Charter Party Agreement before sailing from Antwerp on February 16, 1982.

Both parties' testimony and stipulations were consistent that Hold No. 2 was located between frames 143–163 of the vessel; the No. 2 starboard double bottom tank was located between frames 123–163; and the No. 2 starboard ballast wing tank was located between frames 123–163. This is to say that the deck of Hold No. 2 is in fact the tank top for the No. 2 starboard double bottom tank. The starboard ballast wing tank was connected to the starboard double bottom tank by means of two communication pipes located at the forward and after end of the tank.

From February 16, 1982, the day the Mindanao sailed from Antwerp, Belgium, up to February 25, 1982 at 0830 hours, date and time that the collapse was discovered by the vessel's personnel, the starboard

double bottom tank was completely full of water ballast. Between 1600 hours on February 24, 1982 and 0800 hours on February 25, 1982, approximately 55,000 gallons of ballast water escaped from No. 2 starboard wing tank and at the same time water was found entering Hold No. 2.

But the water entered into Hold No. 2 through cracks in the hold's deck or tank top caused by the movement and subsequent collapse of the cargo. The containers were moving and gouging because of the longitudinal and racking motions that the containers could not withstand. The diagonal lashings slacked off under this longitudinal motion. The extension of the baseplates or shoring beams were not sufficient to hold the containers from movement in any longitudinal motion. (*See* Testimony of Captain Allen, Tr. April 22, 1985, pp. 16–18).

It was proved that the bottom corner castings of the bottom tier containers lined up with the cracks that were found at the forward end of Hold No. 2. The containers were no longer sitting on the dunnage but directly on the hold's deck (on the tank top of the starboard double bottom tank). The cracks were caused by the corner castings of the container moving and gouging on the top plates of the double bottom tank top. *See* Testimony of Kim I. Mac Cartney, Tr. April 15, 1985, p. 93–94.

The water entered the hold from the starboard double bottom tank through the cracks on the tank top caused by the corner castings of the containers. The vessel was made unseaworthy by the bad stowage and securing of the Mindanao. Star Shipping was responsible for the stowage and securing of the containers in Hold No. 2. The stowage and security of the containers was the Charterer's obligation and responsibility under the Time Charter Party Agreement.

Under English law, "the duty of stowing the cargo in the ship lies on the owner, and on the Master as his representative *unless there is an agreement to the contrary.*"

Carver's *Carriage by Sea*, § 1094 at 831 (13th Ed. Vol. 2 1982) (British Shipping Laws Series). Clause No. 8 of the Time Charter Party Agreement was "an agreement to the contrary" for it provided that,

the captain shall prosecute his voyages with utmost despatch, and shall render all customary assistance with ship's crew and boats. The captain (although appointed by the owner), shall be under the order and direction of the charterers as regards employment and agency; *and charterers are to load stow, trim and discharge the cargo at their expense under the supervision of the captain,* who is to sign Bills of Lading (see Clause 50) for cargo as presented."

(Emphasis added). The primary responsibility for loading and stowing the cargo is shifted by Clause No. 8 from the owner, Botelho, to the charterer, Star Shipping, according to English law.

In *Canadian Transport Co. v. Court Line* (1940) A.C. 934, where the Charter Party provided "that the charterers were to load the cargo at their expense under the supervision of the captain, it was held that the reservation of the captain's right of supervision did not have the effect of relieving the charterers of their primary duty to stow safely; *their liability was limited only to the extent that the captain did in fact exercise supervision and control.*" (Emphasis added). *See* Halsbury's *Laws of England*, § 567 at 335 (3d Ed. Vol. 35 1961). In the absence of evidence of supervision by the captain in respect to the stowage, the charterers were responsible for bad stowage.

Lord Atkin in *Canadian Transport Co. v. Court Line* (1940) A.C. at 937, 938 said concerning the words "under the supervision of the Captain," "[i]f it could be proved by the charterers that the bad stowage was caused *only* by the captain's orders, and *that their own proposed stowage would have caused no damage,* no doubt that might enable them to escape liability." (Emphasis added). *See also* Carver's *Car-*

*riage By Sea,* § 1106 at 840 (13th Ed. Vol. 2, 1982) (British Shipping Laws).

Although Captain Malapad was present at the stowage and securing of the containers and requested Captain Arnesen to add more fastenings to the stow, Star Shipping did not prove or submit any evidence that the bad stowage was caused *only* by the orders of Captain Malapad.[9]

Therefore, we hold that to the extent the ship was unseaworthy by the bad stowage and insufficient securing of the containers in Hold No. 2, it was the responsibility of the charterer, Star Shipping, under Clause No. 8 of the Time Charter Party Agreement.

Any additional facts referred to in this discussion shall be deemed included in the Findings of Fact.

## CONCLUSIONS OF LAW

The court has jurisdiction over the subject matter and the parties.

Botelho Group as assignee of Van Munching's claim established a *prima facie* case.

Star Shipping as carrier failed to defeat Van Munching's *prima facie* case.

Star Shipping failed to prove its cross-claim for breach of the Charter Party Agreement by reason of the unseaworthiness of the Mindanao.

The deficiency in Star Shipping's stowage and "securing plan" was the cause of the container cargo collapse and the container movements caused the cracks in the Mindanao's No. 2 hold.

Star Shipping failed to prove that any other cause it alleged contributed to the damage.

Judgment will be entered accordingly.

---

**9.** Similar results have been reached by American courts construing Clause No. 8 under American law. In *Vana Trading Co., Inc. v. S.S. Mette SKOU,* 415 F.Supp. 884 (S.D.N.Y.1976), *aff'd on this issue; rev'd on other grounds,* 556 F.2d 100 (2d Cir.1977), the court held that "under a Charter Party whereby charterer had entire responsibility and authority for load, stow and trim cargo under supervision of captain, participation of officers of vessel in loading was as agents for the charterer and not for the owner." *See also Nichimen Company v. M/V Farland,* 333 F.Supp. 691, 699 (S.D.N.Y.1971); *The Santa Clara,* 281 Fed. 725 (2nd Cir.1922).