INTERCONTINENTAL
TRADING CO., INC.

v.

M/V ZENIT SUN, her engines, tackle, equipment, appurtenances, etc., in rem, Compania Sud–Americana de Vapores, Nordia Shipping AB and ITO Corporation.

Civ. A. No. 86–7190.

United States District Court,
E.D. Pennsylvania,
Civil Division.

May 4, 1988.

Jeffrey S. Moller, Philadelphia, Pa., for plaintiff.

Mary Elisa Reeves, Philadelphia, Pa., for defendants.

## ADJUDICATION

VAN ANTWERPEN, District Judge.

In this non-jury matter, plaintiff seeks damages for frozen plums under the Carriage of Goods by Sea Act, 46 U.S.C.A.App. §§ 1300–1315 (West 1975 & Supp.1987). From the trial on April 11, 1988, we make the following findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

### FINDINGS OF FACT

1. Plaintiff, Intercontinental Trading Co., Inc. (plaintiff), is the shipper and owner of 4,480 cases of Nubiana plums which were shipped on the Motor Vessel Zenit Sun (vessel) from January 21 to February 6, 1986. Defendants Compania Sud–Americana de Vapores and Nordia Shipping AB (defendants) owned and operated the vessel. Defendant ITO Corporation was removed from this case by stipulation.

2. The plums in question were grown in Chile and transported by truck to the Port of Valparaiso where they were loaded on the vessel. Plaintiff's expert witness, a surveyor named John Hughes (Hughes), testified that he was in the Port of Valparaiso in late 1984 and that fruit such as plums is routinely transported to ships without prior refrigeration.

3. The plums were in crates and the bills of lading showed the plums as "clean on board" and did not note any damage. The official export records of the Republic of Chile have no indication of quality but do show that the plums met the "exigible requirements of the regulations for exportation purposes." (No evidence of these regulations was introduced nor will we notice any).

4. When the vessel entered the Port, the holds were not refrigerated; however, prior to receiving the fruit, the holds were pre-cooled. The plums were stored in Hold 3, Level E, in the area directly underneath the hatch opening, along with nectarines in the same hold.

5. The vessel holds were fitted with temperature monitors which were designed to report temperature every two hours (although four hour intervals are sufficient) and sound an alarm if certain limits were exceeded. The reefer record shows that during the voyage the temperature in Hold 3 did not go below 0.7 degrees celsius. Plums do not freeze unless a temperature of at least minus 2.0 degrees to minus 2.4 degrees celsius is reached, and nectarines do not freeze unless a temperature of minus 1.3 degrees to minus 1.7 degrees celsius is reached.

6. Mr. Hughes testified that the reefer temperature records are not reliable unless the temperature sensors are calibrated. However, Caj Johansson, the 2nd Engineer of the vessel, said there was no calibration prior to the voyage and was vague as to when, if ever, a calibration was done, saying that a calibration by "eyes" "used to be done once a year but I don't remember if we ever done just during my time."

7. When the plums were unloaded at Philadelphia, they were damaged from freezing, showing soft, wet, translucent fruit. Mr. Snyder of the U.S.D.A. found frozen fruit in the top and side pallets. On a more detailed inspection, Mr. Hughes found frozen fruit throughout the shipment. The nectarines were not frozen.

8. Because time is of the essence in marketing damaged fruit, the entire lot had to be sold for a total of $12,616.25 whereas it could have brought more had it not been damaged.

9. The commodity summary analysis shows the following plum prices for February 6, 1986:

| SIZE | PRICE |
| --- | --- |
| 60 — 70's | $7.00 — $8.00 |
| Few | $9.00 |
| 80 — 90's | $6.00 — $6.50 |
| 110 — 120's | $5.00 — $5.50 |

10. Plaintiff urges on Exhibit #9 (not received) a probable undamaged sales yield of $30,182.75, which is consistent with the quantities and sizes shown on plaintiff's Exhibits #6, #7, and #8, which were admitted for a net loss due to freezing of $17,566.00, and 6% interest to trial of $2,276.55, for a total of $19,842.55.

## DISCUSSION

In order to recover, plaintiff must prove that the plums were damaged while in the custody of the carrier. Although normally a bill of lading is evidence of the condition of cargo, there was no proof that the plums were visible inside the crates. Accordingly, the bills are not evidence of the condition of the plums when they were loaded on board. Similarly, without a proper foundation, we are unable to discern and will not speculate exactly what the Chilean Government inspection reports stand for. Nevertheless, given Mr. Hughes's first hand description of the Valparaiso harbor facilities as lacking fruit refrigeration equipment, and the further opinion of Mr. Hughes that the freezing damage observed by him just after unloading was not more than two weeks old, convinces us that plaintiff has met its burden of proof.

The inspection of Mr. Hughes was immediate and more thorough than that of any other witness, and his experience was far more extensive than all the other witnesses except Professor Zutter. Unfortunately, Professor Zutter never had an opportunity to observe the plums in question, and had to base his testimony upon the assumption that the temperature measuring equipment on board vessel was functioning properly. As noted, this equipment was never calibrated in the fashion Mr. Hughes testified to.

Whether the failure of the nectarines to also freeze was due to their location in the hold, or certain properties concerning their heat of respiration, we cannot say for certain. We remain convinced, however, that the plaintiff has proven that the plums did freeze in the vessel and the nectarines'

failure to freeze, for whatever reason, fails to convince us otherwise.

■ We must disagree with defendants' calculations of damages as being commercially unreasonable. Given realistic time constraints, imposed by threatened spoilage, as well as standard business practices, we think that the plaintiff acted reasonably and in good faith in disposing of the fruit as it did.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C.A. § 1333(1) (West 1966) and 28 U.S. C.A. § 1337 (West Supp.1987).

2. This case arises under the Carriage of Goods by Sea Act (COGSA), 46 U.S.C.A. App. §§ 1300–1315 (West 1975 & Supp. 1987).

3. Under 46 U.S.C.A.App. § 1303(1)(c), the carrier is bound, before and at the beginning of the voyage, to exercise due diligence to make the holds, refrigerating and cooling chambers, and all other parts of the vessel in which the goods are to be carried, fit and safe for their reception, carriage and preservation.

4. The plaintiff must show that the damage to the plums occurred while they were within the care and custody of the defendants. *McNeely & Price Co. v. Ellerman & Bucknall S.S. Co.*, 100 F.Supp. 339 (E.D.Pa.1954).

■ 5. A shipper can establish a *prima facie* case by proving that the carrier received cargo in good condition, but unloaded it at destination in damaged condition. *Van Muching [Sic] & Co., Inc. v. M/V Star Mindanao*, 630 F.Supp. 433 (E.D.Pa. 1985).

■ 6. No proof having been presented at trial as to Chilean law, the court cannot take judicial notice of the law of Chile, the country which issued the government inspection reports. *Harris v. American International Fuel & Petroleum Co.*, 124 F.Supp. 878 (W.D.Pa.1954).

■ 7. A clean bill of lading is *prima facie* evidence that the carrier received the goods and creates a rebuttable presumption that goods were delivered to the carrier in good condition. *Van Muching [Sic]*, 630 F.Supp. at 439.

8. A clean bill of lading relates, however, only to external or apparent order. *The Ciano*, 69 F.Supp. 35 (E.D.Pa.1946).

■ 9. When, however, goods are packaged, further evidence is needed. "The Court, in addition to the good order receipt, 'may consider the outturn itself as evidence,' The Glasgow Maru, supra, 102 F.2d at page 451. Of course, this means more than just the fact that the goods are damaged. There must be something about the condition of the goods themselves or their stowage or other circumstances from which the Court can infer that the only damage appearing at discharge did not exist at the time the goods came into the possession of the carrier. Of course, if the damage is of a kind which could not in the nature of things have occurred before shipment, that will be enough...." *McNeely & Price Co. v. The Exchequer*, 100 F.Supp. 343, 344 (E.D.Pa.1951). The plums were subjected to refrigeration on board the defendants' ship; the cause of the spoiling was freeze damage.

10. Said damage was due to failure to use due diligence to maintain proper temperature in a fit and safe manner as required by 46 U.S.C.A.App. § 1303(1)(c).

■ 11. The Shipper is under a duty to mitigate damages. *C. Itoh & Co. (America), Inc. v. Hellenic Lines, Ltd.*, 470 F.Supp. 594 (S.D.N.Y.1979). The plaintiff acted reasonably and attempted to mitigate damages.

■ 12. "The usual measure [of damages] is the difference between the fair market value of the goods at the port of destination in the condition they were in when shipped and their value as damaged." *Id.* at 598.

13. The defendants are liable to the plaintiff in the amount of $17,566.00 with interest of $2,276.55.